**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAY EMBREY and all similarly situated employees of the City of Calumet City, Illinois,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 C 3685** |
| | ) | |
| **THE CITY OF CALUMET CITY, ILLINOIS, GEORGE VALLIS, ROGER MUNDA, NICK MANOUSOPOULOS, BRIAN WILSON, EDWARD GONZALEZ,** | ) ) ) ) ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW  F. KENNELLY, District Judge:

Jay Embrey has sued the City of Calumet City, its Director of Purchasing and Personnel George Vallis, and current or former city aldermen Roger Munda, Nick Manousopoulos, Brian Wilson, and Edward Gonzalez (the "alderman defendants"). Embrey alleges that defendants retaliated against him for protected political activity by demoting him from Calumet City's Commissioner of Streets and Alleys to a lesser position and that they retaliated against him further for filing this lawsuit. Before the Court are two motions for summary judgment, one joined by all defendants and one joined only by the alderman defendants. For the reasons stated below, the Court grants the first motion in part and postpones decision on the second.

### Background

The Court takes the following facts from the parties' memoranda of law and

statements of uncontested facts. On a motion for summary judgment, the Court construes all facts favorably to the nonmoving party and makes reasonable inferences in that party's favor. *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 552 (7th Cir. 2011).

Calumet City is an Illinois municipal corporation that operates pursuant to the Illinois Municipal Code. The municipality is run by a city council consisting of a mayor and seven elected aldermen, each of whom runs for election every four years. In 2009 and 2010, when the events at issue in this case occurred, the mayor was Michelle Qualkinbush, and the alderman defendants were either running for or serving on the city council. The Municipal Code provides that "[t]he mayor . . . by and with the advice and consent of the city council . . . may appoint" various public officers, including "a commissioner of public works" and "other officers necessary to carry into effect the powers conferred upon municipalities." 65 ILCS 5/3.1-30-5(a).

In May 1998, Calumet City hired Embrey as a maintenance worker in its Department of Streets and Alleys. He was promoted to foreman in the same department in 2004. On June 8, 2007, with the approval of the city council, Qualkinbush appointed Embrey to a one-year term as the Commissioner of Streets and Alleys. The position's description in the Calumet City Code was as follows: "There is hereby established the position of commissioner of streets and alleys, who shall be appointed by the mayor by and with the advice and consent of the city council." CALUMET CITY, ILL., CODE § 2-461(a) (1980).

> The commissioner shall have charge of the construction and repair of all street improvements, paving, curbing, sidewalks, bridges, viaducts, subways and all other public improvements. The commissioner shall report to the city council any ordinance violation with relation to the care or use of streets, alleys or sidewalks in the city, of which he may become cognizant.

2

*Id*. § 2-462 (1980).

The parties agree that Embrey's duties as commissioner included "manag[ing] the day to day decisions which needed to be taken care of. He managed the employees, scheduled the work, supervised the work and participated in the preparation of the department's annual budget." Defs.' L.R. 56.1 Stmt. ¶ 16; Pl.'s Resp. to Defs.' L.R. 56.1 Stmt. ¶ 16. Embrey maintains that he was also responsible "for the duties of a foreman, which included payroll and scheduling." Pl.'s Resp. to Defs.' L.R. 56.1 Stmt. ¶ 16. The parties further agree that Embrey reported directly to the mayor, though Embrey asserts that he also reported to Vallis.

Embrey was reappointed Commissioner in 2008. In 2009, Qualkinbush ran for reelection. She and Manousopoulos, Wilson, and Gonzalez, who were running for city council seats, were members of the "United to Serve You" party, and they ran as part of a slate of candidates in the February primary and April general elections. Embrey performed political work on behalf of the United to Serve You party, including putting up signs, knocking on doors, and serving as a precinct leader. The parties agree that "[a]t some point, a rift developed within the United to Serve You party in connection with the 2009 primary election." Defs.' L.R. 56.1 Stmt. ¶ 36. There is some suggestion that this rift arose when Munda ran as an independent with the support of the other alderman defendants, ultimately defeating Qualkinbush's chosen candidate for Alderman of the Fifth Ward. The precise source of the tension is not material to the present motions.

Qualkinbush testified that Calumet City experienced severe financial problems in 2009, although Embrey disputes the extent of these problems. On April 27, 2009, the

City Council Public Works Committee, chaired by Manousopoulos, met at City Hall to discuss city grass-cutting expenses. One topic of discussion was the potential to save money by using city employees rather than outside vendors to cut grass on public land. The precise chronology and content of the communication between Manousopoulos and Embrey on this matter is disputed. The parties generally agree, however, that Manousopoulos suggested bringing the grass cutting in-house and that Embrey – whose employees would be implicated by this change – voiced uncertainty regarding whether this would be feasible or desirable, leading to some degree of tension between the two.

At some point in 2009, Qualkinbush proposed to combine the Streets and Alleys Department with the Sewer and Water Department under a single commissioner. The former Commissioner of Sewer and Water was retiring. In July 2009, the city council adopted an appropriations ordinance for 2009-2010, which created the position of "Commissioner of Streets, Alleys, Water and Sewer." Qualkinbush supported Embrey for this position. The ordinance also affected the position of streets and alleys foreman, which Embrey had held before becoming commissioner. Defendants argue that the position was eliminated and replaced with a new position of deputy commissioner. Embrey maintains that the ordinance simply changed the position's title from foreman to deputy commissioner without changing its responsibilities. In early September 2009, Manousopoulos advised Embrey that it would be in his best interest to submit a letter of resignation because Manousopoulos would be "giving [Embrey's] job" to Nick Yovkovich, another employee in Embrey's department. Embrey Dep. at 79.

On September 3, 2009, Qualkinbush sent a letter to the "Members of the City

4

Council" that stated, "I am herewith submitting for your approval, the appointment of Kevin Jay Embrey . . . as Street & Alley/Water/Sewer Commissioner for the City of Calumet City, for a term to expire on April 30, 2010." Pl. Ex. 8. At a city council meeting on September 10, 2009, however, Yovkovich was appointed to the new position and was unanimously approved by the city council. Defendants characterize Yovkovich's appointment as an act taken by Qualkinbush, who testified that despite the fact that she had supported Embrey, she decided that it would be "in the best interest of the city to just accommodate the Aldermen with their request and move this forward so that everybody would get paid." Qualkinbush Dep. at 128:8-10. Embrey maintains that he was appointed by Qualkinbush via her September 3 letter and that Yovkovich was appointed not by Qualkinbush but by Manousopoulos.

After the city council meeting, Embrey was returned to his original maintenance position. He filed a union grievance on October 30, 2009, contending that this violated section 2-231 of the Calumet City Code. That provision states that if the mayor appoints an employee who has worked for the City for more than three years to "head any department of the City or in a supervisory position not covered by a Union contract, such employee shall be entitled to return to the position held with the City prior to the appointment . . . in the event such appointment does not receive the consent of the City Council or such appointment is not renewed after the term has expired." Embrey's grievance form stated, "The City has said the foreman position is no longer available, and returned me to a position at a lesser rate of pay . . . . Regardless of availability of foreman, I believe that I should be returned to the position guaranteed me or at least returned to the same rate of pay . . . ." Def. Ex. 15.

On January 20, 2010, Embrey received a denial of his grievance, signed by Vallis as the "Mayor's Designee," stating in part that the "City was unable to return the grievant to the foreman position which he previously held since the position was eliminated. Therefore, the grievant was returned to the next highest position that he held." *Id.* The parties dispute the degree to which Vallis had input into or authority to make the decision regarding Embrey's change of position.

Embrey filed this lawsuit in June 2010 and gave his first deposition on April 11, 2011. Two days later, on April 13, 2011, he was assigned to drive a truck throughout the city, collecting and chipping tree branches. He was later given this assignment again and continued in this task for approximately two weeks. He considered this work to be undesirable, in part because it could be dangerous. He believes that he received the wood-chipping assignment in retaliation for his having filed this lawsuit, specifically for his April 11 deposition testimony, and he amended his complaint to add a claim regarding these events.

## Discussion

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56(c). A court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmoving party must offer something more than a 'scintilla' of evidence to overcome summary judgment . . . and must do more than 'simply show that there is some metaphysical

6

doubt as to the material facts.'" *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

1.      **First Amendment termination claims**

In count one of Embrey's complaint, he alleges that he "engaged in constitutionally protected speech and association under the First Amendment of the U.S. Constitution when he actively supported Michelle Qualkinbush in her bid for reelection" and that, as a result, the five individual defendants "took adverse employment action against the Plaintiff in the form of demotion without being returned to his former position as required by law." Am Compl. ¶¶ 49, 52. Embrey claims that the alderman defendants "specifically ordered and demanded the removal of the Plaintiff from his position as Commissioner of Public Works" and that Vallis "was personally responsible for demoting the Plaintiff with knowledge that such a demotion and reassignment was contrary to law." *Id*. ¶ 57. In count four, he makes essentially the same claim against Calumet City. In both claims, Embrey seeks relief under 42 U.S.C. § 1983 for the alleged violation of his First Amendment rights.

Government employment does not automatically deprive a citizen of his or her First Amendment right to free speech on matters of "public concern." *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994) (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968)). The Seventh Circuit has noted that the "public concern" analysis – also known as the *Connick-Pickering* test – includes an exception for a "subset" of cases known as "political patronage cases," which "provide that policymakers and confidential

7

employees may be discharged due to their political beliefs." *Id*. at 1220.

Defendants argue that the Court should analyze Embrey's claims under the political patronage framework rather than the *Connick-Pickering* test. Embrey appears to argue that the patronage cases do not apply because his discharge was based on personal disagreements and/or non-political speech. This argument is directly contradicted by the allegations in his complaint, quoted above, to the effect that he was discharged because of his work on behalf of Qualkinbush's campaign. *See Bonds v. Milwaukee County*, 207 F.3d 969, 978 (7th Cir. 2000) (noting that the patronage cases "exempt employer action from *Pickering* balancing when it is based primarily on political motivations [including] employer action against political expression" such as electoral opposition) (citation omitted). The Court concludes that the political patronage cases provide the proper framework for its analysis.

The Supreme Court has recognized that "an exception to the constitutional prohibition on patronage employment practices exists when [First Amendment] rights are outweighed by the government's need for political loyalty in employees, as is the case in . . . policymaking . . . positions." *Selch v. Letts*, 5 F.3d 1040, 1043 (7th Cir. 1993) (citing *Elrod v. Burns*, 427 U.S. 347, 367 (1976)). The policymaking exemption is founded on the principle that "[i]n our system, control of departments at all levels is important for those given the task of governing [and] an elected official gains this control by strategically placing loyal people in these departments." *Kolman v. Sheahan*, 31 F.3d 429, 433 (7th Cir. 1994). An employee's daily responsibilities, however, do not have to involve formal crafting of policy to qualify for the exemption. Rather, "[t]he test is whether the position held by the individual authorizes, either directly or indirectly,

meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981).

Defendants argue that the position from which Embrey was terminated, Commissioner of Streets and Alleys, was a policymaking position exempt from First Amendment protection. They rely in large part on their contention that Embrey's position is analogous to that of Calumet City's "Coordinator for the Department of Community and Economic Development," which another judge in this district found to be exempt on the basis of its "inherent powers." *Garrison v. Calumet City*, 450 F. Supp. 2d 869, 878 (N.D. Ill. 2006). Embrey argues that his position was distinguishable from those at issue in *Garrison* and similar cases because his responsibilities did not involve the making or discretionary implementation of policy and did not otherwise implicate the need for political loyalty.

The decision in *Garrison* largely relied on *Heck v. City of Freeport*, 985 F.2d 305 (7th Cir. 1993). Both courts found significant that their respective plaintiffs were "the highest ranking employee in one of the city's . . . primary departments" and had been appointed by the mayor for a term "limited to that of the mayor." *Heck*, 985 F.2d at 309-10. The judge in *Garrison* noted additional factors under *Heck* that "instruct that the position . . . is a position for which political affiliation is permissible," including that the plaintiff had "a staff of employees," "was accountable to the mayor and works with many other high level officials including . . . a number of aldermen," and "prepares and submits a budget to the city council and has discretion to spend within that budget." *Garrison*, 450 F. Supp. 2d at 876. Embrey's former position shares many of these

characteristics. Although the record does not indicate that the term of the Commissioner of Streets and Alleys was expressly limited to that of the mayor, he was certainly the highest ranking employee in his department. Like Garrison, he was appointed by the mayor with the advice and consent of the city council, met one-on-one with the mayor and aldermen, had a staff, and prepared a budget.

Embrey does not appear to have crafted "policy" as directly as did Garrison, whose responsibilities included "develop[ing] programs for neighborhood rehabilitation . . . and to promote and secure economic development." *Id*. at 875. The Seventh Circuit has recognized, however, that employees whose primary responsibility is the provision of basic services can qualify for the policymaking exemption:

> The primary function of any local governmental entity is the provision of services [including] quasi-utility functions such as water, garbage, and sewage services. Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal. Therefore, the fact that plaintiff's position concerned the provision of water to all citizens does not mean that the Water Department had no goals about which there could be principled disagreements.

*Tomczak v. City of Chicago*, 765 F.2d 633, 642 (7th Cir. 1985). "Policymaking and policy implementation may occur at many levels, even within a particular office whose sphere of authority is narrowly circumscribed." *Selch*, 5 F.3d at 1046.

Embrey testified that it was his responsibility to

> [m]anage the day to day, any – any decision or – as far as anything that needed to be taken care of, I took care of. I managed all the employees, I scheduled all the work, basically checked on all the work, made sure it was done. I also carried on my duties as foreman when I was the commissioner, which meant payroll, scheduling.

Embrey Dep. at 16:4-10.  He testified that he had the authority to discipline and suspend employees, that he was the only employee in his department who was not subject to a collective-bargaining agreement, and that he sat in on union negotiations as a management representative.  He attended "department head meetings" convened by the mayor, at which he "always encouraged any other department head, if they had anything that they needed from the public works, to let me know," indicating that he had the ability to authorize other actions by or on behalf of his department.  *Id*. at 22:9-11.  All of these tasks involved "goals about which there could be principled disagreements," *see Tomczak*, 765 F.2d at 642, as illustrated by Embrey's disagreement with Manousopoulos over the issue of grass cutting.

The strongest piece of evidence in Embrey's favor is his testimony that he did not personally determine which streets were to be resurfaced.  Embrey Dep. at 16:21-25.  Instead, an outside consulting firm made those determinations in consultation with the city council.  This indicates that, unlike the plaintiff in *Selch*, who was also a road commissioner, Embrey does not appear to have had "almost unbridled authority to determine where and when . . . work was to be done."  *See Selch*, 5 F.3d at 1045.  Embrey's responsibility for scheduling, however, indicates that, like Selch, he was able to decide when work was done and in what sequence.  Also like Selch, Embrey's diverse slate of responsibilities indicates that his "effective implementation of road maintenance policy in diverse geographic areas entailed more than ensuring that maintenance procedures were completed."  *See id*. at 1046.  This is all the more apparent because, unlike Selch, Embrey's position as Commissioner was not one that "falls at the lower end of the management hierarchy."  *Id*. at 1047.

11

The district court in *Selch* noted that Selch's position did not appear to fall cleanly within the guidelines established by *Nekolny*, which states that an exempt position is one that entails the provision of "meaningful input into government decisionmaking on issues where there is room for principled disagreement on the goals or their implementation." *See Nekolny*, 653 F.2d at 1170. In a description that could apply equally to Embrey's position, the district court found that

> [a]t least in terms of Mr. Selch's communications with his superiors, it would be a stretch to say that his job entailed "meaningful input into government decision making." Except for the information he supplied in conjunction with the budgeting process, there was little evidence that he was relied upon to provide critical information or other "input" to the hierarchy of the highway department. Moreover, if the term "goals" is broadly construed, there was little room for disagreement over Mr. Selch's goals. Broadly put, Mr. Selch's goal was simply to insure that the road construction and maintenance work in his subdistrict was effectively and speedily undertaken.

*Selch*, 5 F.3d at 1043 (internal quotations and citation omitted). The Seventh Circuit nonetheless upheld the district court's finding that, despite Selch's limited discretion with regard to the actual making of policy, the position entailed a "significant amount of responsibility" and an "ability to 'threaten the goals of the in-party,'" making "political affiliation . . . an appropriate requirement." *Id*.

The Court concludes that Embrey possessed abilities and responsibilities similar to those of the plaintiff in *Selch*. Embrey's duties, like Selch's, "were not strictly circumscribed and, according to his own [description], required something substantially more than simple ministerial competence." *See Tomczak*, 765 F.2d at 642. Although Embrey's position did not carry as much authority as some positions that have qualified for the policymaking exemption, the supervisory and management responsibilities he exercised as head of his department clearly distinguish it from positions that have not.

12

*See, e.g.*, *Mitchell v. Randolph*, 215 F.3d 753, 756-57 (7th Cir. 2000) (finding that a position that was essentially "clerical in nature" was not exempt from First Amendment protection); *Vajner v. City of Lake Station, Ind.*, No 09 C 245, 2011 WL 1671637, at *6 (N.D. Ind. May 3, 2011) (finding employee not exempt when her authority did not include supervising employees or involve "discretionary judgment, management oversight, or meaningful participation").

For these reasons, the Court grants defendants' motion for summary judgment on counts one and four.

## 2.    Remaining claims

In count seven of Embrey's complaint, he alleges that defendants violated his First Amendment rights by giving him an undesirable assignment in retaliation for his having initiated this lawsuit and testified at a deposition.  Although the parties' Local Rule 56.1 statements briefly describe the relevant events, their briefs include no discussion of the issue.  Indeed, defendants do not even specifically request summary judgment on count seven in their briefs, stating only that the "Court's determination in favor of defendants on [the policymaking exemption issue] will dispose of Counts I, IV, and VI."  Defs.' Mem. at 11.

Even if this somehow reflects only a typographical error on defendants' part, the allegations in count seven implicate facts and legal principles that differ from those involved in the First Amendment claims regarding Embrey's demotion.  Summary judgment on this count therefore would not follow from defendants' arguments regarding the policymaking exemption even if they had expressly requested it.  The Court is disinclined to grant summary judgment on a claim on which defendants have not made,

and Embrey has not responded to, any argument. *See Walker v. Sheahan*, 526 F.3d 973, 980 (7th Cir. 2008) (reversing grant of summary judgment based on an argument "never raised" by movant where non-movant "had no notice that the adequacy of his retaliation evidence was being challenged"); *cf. Golden Years Homestead, Inc. v. Buckland*, 559 F.3d 457, 462 (7th Cir. 2009) (upholding grant of summary judgment on count not expressly addressed by movant when non-movants "took the opportunity in its response to the motion to present its evidence and argument").

The Court therefore declines to grant summary judgment on count seven but invites defendants to submit a motion for summary judgment that addresses this claim if there is an appropriate basis for them to do so. The Court further postpones consideration of Embrey's state-law claims and the alderman defendants' second motion for summary judgment until after determining whether defendants will seek summary judgment on count seven.

### Conclusion

For the reasons stated above, the Court grants defendants' first motion in part and denies it in part [docket no. 56] and enters summary judgment in favor of defendants on counts one and four of Embrey's complaint. The case is set for a status hearing on January 25, 2012 at 8:45 a.m., in chambers, to set a schedule for further proceedings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 18, 2012

14